In the Matter of James Earl HALLS, aka Jim Halls, Marie Louise Halls, Engaged in Farming, Debtors.

Bankruptcy No. 87–951–C.

United States Bankruptcy Court, S.D. Iowa.

Oct. 27, 1987.

Paul H. Wieck, II, Osceola, Iowa, for debtors.

G. Mark Rice, Des Moines, Iowa, for FDIC.

Elizabeth A. Nelson, Des Moines, Iowa, Chapter 12 trustee.

Linda R. Reade, Asst. U.S. Atty., Des Moines, Iowa, for U.S.

ORDER ON MOTION FOR ORDER
PROHIBITING USE OF CASH
COLLATERAL

LEE M. JACKWIG, Bankruptcy Judge.

On June 18, 1987 a hearing on a motion for order prohibiting use of cash collateral filed on June 4, 1987 by the Federal Deposit Insurance Corporation (FDIC) and the debtors' resistance filed on June 15, 1987 came on for telephonic hearing in Des Moines, Iowa. G. Mark Rice appeared on behalf of the FDIC and Paul H. Wieck, II appeared on behalf of the debtors. The issue before the court is whether the FDIC has an enforceable security interest in payments made and expected to be made under the 1986 and 1987 Feed Grain Program (Program). The matter has been submitted on documents and briefs.

## FACTUAL BACKGROUND

On January 16, 1986 the debtors borrowed $12,000.00 from the FDIC's predecessor in interest, the Osceola State Bank and Trust (Bank). In need of operating capital, the debtors borrowed $65,000.00 from the Bank on May 19, 1986. On that same date, the debtors executed a security agreement granting the Bank a security interest in, among other things, the following:

All crops, livestock and supplies used or produced in farming operations, whether now owned or existing or hereafter existing or acquired; all accounts, chattel paper, documents, instruments, contract rights and general intangibles, entitlements and payments from all state or federal farm programs, whether now owned or existing or hereafter existing or acquired; and all proceeds or products of any of the above and the proceeds from any government farm program.

FDIC's Exhibit B. The Bank's security was perfected properly with the Iowa Secretary of State on May 20, 1986. Apparently the Farmers Home Administration possessed a superior security interest in the debtors' chattels but subordinated that interest to the Bank.

The debtors enrolled in both the 1986 and the 1987 Programs. Under the Program, producers receive deficiency payments and price support loans for compliance with certain requirements such as reducing crop acreage. Some of the program payments are made in the form of negotiable certificates that can be redeemed in cash or commodities.[1] These certificates are referred to in the agricultural vernacular as PIK (payment-in-kind) certificates.

The debtors contend they have received $8,922.92 in 1986 program payments and $22,217.42 in 1987 program payments. The debtors assert that approximately half of the payments have been made in PIK certificates. The debtors expect an additional $29,985.59 in 1986 program payments to be made in the fall of 1987. Further, the debtors report they have the following in their possession: a check from the Commodity Credit Corporation representing the loan proceeds on the debtors' 1986 sealed crop; an insurance check in the amount of $8,670.00; and crops on hand worth $49,330.00.

## DISCUSSION

### I.

The debtors contend that the statutory and regulatory provisions governing the Program preclude the FDIC from encumbering any program payments made in the form of PIK certificates and any 1987 program payments made in the form of cash. The debtors thus conclude that such payments are not cash collateral subject to protection pursuant to 11 U.S.C. section 363(a).

### A. *Cash Payments*

 The statutory provisions concerning the Program are found at 7 U.S.C. section 1444e. Subsection 1444e(k) states that the assignment of program payments are governed by the assignment provisions of the Soil Conservation and Domestic Allotment Act at 16 U.S.C. section 590h(g). That provision provides that:

A payment which may be made to a farmer under this section, may be assigned, without discount, by him in writing as security for cash or advances to finance making a crop, handling or marketing an agricultural commodity, or performing a conservation practice. Such assignment shall be signed by the farmer and witnessed by a member of the county committee or by an employee of such committee, except that where the assignee is a bank whose deposits are insured by the Federal Deposit Insurance Corporation, the Farmers Home Administration, or a production credit association supervised by the Farm Credit Administration, such assignment may be wit-

---

**1.** Certificates may be "generic" or commodity-specific. 7 C.F.R. section 770.4(g). If generic, the certificate may be exchanged for any commodity made available by the Commodity Cred-

it Corporation. *Id.* If commodity-specific, the certificate may be exchanged only for the kind and quantity indicated on the face of the certificate. *Id.*

nessed by a bonded officer of the lending institution. Such assignment shall be filed with the county committee. *Such assignment shall not be made to pay or secure any preexisting indebtedness.* This provision shall not authorize any suit against or impose any liability upon the Secretary or any disbursing agent if payment to the farmer is made without regard to the existence of any such assignment. The Secretary shall prescribe such regulations as he determines necessary to carry out the provisions of this subsection.

*Id.* (emphasis added). The purpose underlying this provision is to ensure that the intended beneficiary of government payments receives the payments. *J. Catton Farms v. First Nat. Bank of Chicago,* 779 F.2d 1242, 1246 (7th Cir.1985).

Regulations promulgated pursuant to section 590h set forth the purposes for which a payment may be assigned. The regulations state in part:

(a) A payment which may be made to a producer under any program to which this part is applicable may be assigned only as security for cash or advances to finance making a crop, handling or marketing an agricultural commodity, or performing a conservation practice, for the current crop year. No assignment may be made to secure or pay any preexisting indebtedness of any nature whatsoever.

(b) To finance making a crop means (1) to finance the planting, cultivating, or harvesting of a crop, including the purchase of equipment required therefor and the payment of cash rent for land used therefor, or (2) to provide food, clothing, and other necessities required by the producer or persons dependent upon him.

7 C.F.R. sections 709.3(a) and (b). 7 C.F.R. Part 709 is applicable to "any ... program to which this part is made applicable by the individual program regulations." 7 C.F.R. section 709.1. The regulations regarding the Feed Grain Program are found at 7 C.F.R. Part 713. 7 C.F.R. section 713.-153(b) states that "[a]ny producer entitled to any payment may assign any such pay-

ments which are made in cash in accordance with regulations governing assignment of payment found at Part 709 of this chapter." Thus, assignments of program payments made in cash are subject to the limitations of 7 C.F.R. Part 709.

By the terms of the aforementioned statutory and regulatory provisions, program payments made in cash may not be assigned to secure preexisting indebtedness. *See generally, Matter of Azalea Farms, Inc.,* 68 B.R. 32 (Bankr.M.D.Fla.1986) (security interest would not attach to milk program payments by virtue of 7 C.F.R. section 709).

Application of these provisions to the instant case means that the FDIC cannot encumber 1987 program payments made in cash since the FDIC did not finance the 1987 crop. The language of 7 C.F.R. section 709.3(a) clearly shows that the only payments that may be encumbered are those directly related to the crop that a lender assisted in making by lending money. The provision states that program payments "made be only assigned as security for cash or advances to finance making a crop ... *for the current year.*" *Id.* (emphasis added). Moreover, the regulations state that "no assignment may be made to secure or pay *any pre-existing indebtedness of any nature whatsoever.*" *Id.* (emphasis added). For program payments that relate to crops that the creditor had no part in making, such payments cannot be subjected to the creditor's security interest. Section 709.3(a) does permit the FDIC to encumber the 1986 payments because the FDIC's predecessor in interest advanced money for putting in the 1986 crop.

■ It is important to note that state law regarding secured transactions contains no such limitation on a creditor's ability to encumber government payments. *See generally* Iowa Code sections 554.9101 *et seq.* This conflict between the federal scheme and state law must be resolved in favor of the federal law. It is a fundamental precept that to the extent a conflict exists between state and federal law, state law law must yield. U.S. Const., art. VI,

cl. 2; *Maryland v. Louisiana*, 451 U.S. 725, 747, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981); *Johnson v. First Nat. Bank of Montevideo, Minn.*, 719 F.2d 270 (8th Cir. 1983) *cert. denied* 465 U.S. 1012, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984).

### B. *PIK Payments*

■ Recently promulgated regulations preclude debtors from assigning PIK certificates as security. 7 C.F.R. section 770.6 provides that "[N]ot withstanding any other provision of this chapter, a payment made under this part may not be the subject of an assignment, except as determined and announced by the CCC."[2] An examination of the history of this provision reveals that when 7 C.F.R. Part 770 was published as an interim rule, the Part contained no provision like that now found at 7 C.F.R. section 770.6. 51 Fed.Reg. 8453. These interim rules were revised on June 16, 1986. 51 Fed.Reg. 21828. Among the revisions was the addition of section 770.6 as it is found in its present form. 51 Fed.Reg. 21835. The explanatory remarks accompanying the publishing of section 770.6 state that this provision was "added to provide that assignments of payments made in accordance with 7 C.F.R. Part 709 shall not be permitted." 51 Fed.Reg. 21831. As discussed earlier, 7 C.F.R. Part 709 permits an assignment of payments for making a crop for the current year. 7 C.F.R. section 709.3(a). However, section 770.6 prevents debtors from assigning PIK certificates to creditors for purposes of planting, cultivating and harvesting a crop.

Further support for the conclusion that certificates can not be encumbered is found at 7 C.F.R. section 770.4(b) which states:

(b) Liens, encumbrances, and State law.
(1) The provisions of this section or the commodity certificates shall take precedence over any state statutory or regulatory provisions which are inconsistent with the provisions of this section or with the provisions of the commodity certificates.

(2) Commodity certificates shall not be subject to any lien, encumbrance, or other claim or security interest, except that of an agency of the United States Government arising specifically under Federal statute.

The plain meaning of the language of this provision clearly shows that certificates are not to be subject to any encumbrances. This is understandable in light of emphasis placed on the transferability of certificates by section 770.4.[3] Ease of transfer would be thwarted if the certificates were subject to various state laws governing secured transactions.

In support of its argument that PIK certificates can be encumbered, the FDIC cites *In re Sunberg*, 729 F.2d 561 (8th Cir.1984). In that case, the Eighth Circuit determined that (1) PIK contracts could serve as collateral as a matter of state law and (2) federal regulations in effect at that time did not preclude creditors from taking a security interest in PIK benefits. The regulations in question stated as follows:

(e) Assignments with respect to quantities of a commodity which can be received by a producer as payment in kind will be recognized by the Department [of Agriculture] only if such assignment is made on Form CCC–479, Assignment of Payment–In–Kind, executed by the assignor and assignee, and filed with the county committee.

(f) Except as provided in paragraph (e) of this section, any payment in kind or portion thereof which is due any person shall be made without regard to questions of title under State law, and without regard to any claim of lien against the commodity, or proceeds thereof, which may be asserted by any creditor.

7 C.F.R. section 770.6(e) and (f) (1984). The debtors in *Sunberg* argued these regulations permitted them to take PIK benefits free and clear of creditors' liens. The

---

**2.** No CCC announcements permitting PIK certificates to be assigned have been found.

**3.** The transfer of PIK certificates under the regulations is accomplished simply by endorsing the certificate, showing the name of the transferee, dating and signing the certificate. 7 C.F.R. section 770.4(c).

Eighth Circuit rejected this assertion. It found that the provisions were intended only to prevent the government from being entangled in third party disputes. This court finds that *Sunberg* is inapposite to resolving the dispute over the PIK payments in that the operative regulations now before the court were not considered by the *Sunberg* court. *See generally, In re Bechtold,* 54 B.R. 318, 321 (Bankr.D.Minn.1985).

Furthermore, the explanatory remarks which preface the final rules concerning PIK certificates indicate that section 770.-4(b) was promulgated to ensure the transferability of certificates. 51 Fed.Reg. 36904. There is no mention in the remarks of any concern with protecting the government. Indeed, no concern is warranted given the likelihood that few, if any, third party disputes will arise since the certificates cannot be encumbered by nongovernment creditors.

Finally, it should be noted that sections 770.4 and 770.6 did not exist in their present form at the time the debtors and the Bank executed the May 19, 1986 security agreement.[4] In addressing whether the transaction in issue is subject to these regulations, the court employs a balancing test. The United States Supreme Court has stated:

> [R]etroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles. If the mischief is greater than the ill effect of the retroactive application of a new standard, it is not the type of retroactivity which is condemned by law.

*SEC v. Chenery Corp.,* 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947). The Seventh Circuit Court of Appeals has stated that "[i]n analyzing whether any manifest injustice would result from retroactive application of a rule, we consider the reliance of the parties on pre-existing law, the effect of retroactivity on accomplishing the purpose of the law, and any injustice arising from retroactive application." *NLRB v. Chicago Marine Containers,*

*Inc.,* 745 F.2d 493, 499 (7th Cir.1984). *See also Iowa Power & Light Co. v. Burlington Northern, Inc.,* 647 F.2d 796, 812 (8th Cir.1981) (balancing of hardship on affected parties with public ends in determining whether policy to be retroactively applied).

In the instant case, the balance tips decidedly in favor of applying the regulations retrospectively. It is clear that transferability of certificates is an important element of the regulatory scheme in question. Indeed, it is common knowledge that a market for certificates has developed in which certificates are bought and sold, usually for a premium. Permitting parties to encumber the certificates would eviscerate the regulatory scheme in that the transfer of the certificates would be seriously interrupted. Against the deleterious effect of a "prospective only" construction, the court must examine the impact on the parties of a retrospective application. In this case, the effect is minimal. With respect to reliance on pre-existing law, the court notes that negotiable PIK certificates are a product of the Food Security Act of 1985. See Food Security Act of 1985, Pub.L. No. 99–198, section 1005 (now codified at 7 U.S.C. section 1445b–4(b)). The regulations were promulgated in response to the Act. At the time the security agreements were executed, no law existed with regard to negotiable PIK certificates. Consequently, there could be no reliance on pre-existing federal law.

The parties cannot rely on state law as a base upon which to build a reliance argument. As previously discussed, state law must yield to the extent a conflict exists between state and federal law. By permitting the FDIC to encumber the certificates under state law, the regulations would be relegated to an inferior status vis-a-vis state law. The supremacy clause prohibits that outcome.

## II.

After taking into account the foregoing statutes and regulations, the only amounts that constitute cash collateral are the 1986

---

4. These provisions first appeared on June 16, 1986 as interim rules. 51 Fed.Reg. 21835. They became final rules on October 16, 1986. 51 Fed.Reg. 36921.

program payments made in cash. The debtors state that most of the 1986 and 1987 program payments received thus far have been used to plant the 1987 crop. The FDIC objects to the use of the cash collateral on the ground the debtors have received no court authorization for such use.

The Bankruptcy Code requires notice and hearing before property of the estate may be used, other than in the ordinary course of business. 11 U.S.C. section 363(b)(1). Under section 363(c)(2), debtors may use cash collateral in the ordinary course of business only if (1) entities that have an interest in the cash collateral consent or (2) the court authorizes, after notice and hearing, such use. Typically, if a business is authorized to operate by court order or operation of the Code, no notice and hearing is required before property of the estate may be used. 11 U.S.C. section 363(c)(1). The cash collateral exception to this rule is based upon the unique nature of cash collateral and the need for special protections to prevent its dissipation. 2 *Collier on Bankruptcy*, ¶ 363.04, p. 363–23 (15th ed. 1986).

The record suggests that the debtors used 1986 cash payments without obtaining the FDIC's consent or the court's authorization upon application and upon notice and hearing. If the parties are unable to agree on appropriate plan treatment to be afforded FDIC for the use of the 1986 cash payments, the matter will be addressed at the confirmation hearing.

### CONCLUSION AND ORDER

WHEREFORE, based upon the foregoing analysis, only the 1986 program payments made in cash constitute cash collateral.

THEREFORE, the FDIC's motion for order prohibiting use of cash collateral is granted only as to the 1986 program payments made in cash. As to the 1987 payments made in cash and the 1986 and 1987 payments made in the form of PIK certificates, the motion is denied.