Virgil E. PERKINS and Estelle M. Perkins, Appellees,

v.

FARMERS TRUST AND SAVINGS BANK, Appellant.

FARMERS TRUST AND SAVINGS BANK, Appellant,

v.

Virgil E. PERKINS and Estelle M. Perkins, Appellees.

No. 87–459.

Supreme Court of Iowa.

April 13, 1988.

Christopher A. Bjornstad of Cornwall, Avery, Bjornstad & Scott, Spencer, for appellant.

Robert W. Sackett of Sackett, Sackett & Howe, P.C., Spencer, for appellees.

Considered by McGIVERIN, C.J., and HARRIS, CARTER, LAVORATO, and ANDREASEN, JJ.

HARRIS, Justice.

Two liens compete for the same crop. A bank holds a security interest and farm landlords hold a statutory lien for unpaid cash rent. This dispute concerns which of the liens has priority. The trial court held for the landlords. We affirm.

Virgil and Estelle Perkins [the landlords] own farmland which in 1979 they leased to their son and daughter-in-law [the tenants]. The lease became effective March 1, 1980. The landlords were to receive $12,000 annual cash rent. The lease provided the landlords a lien on crops grown on the farm and they were entitled to one by statute. Iowa Code § 570.1.[1]

In anticipation of this lease the tenants entered into a security agreement with the bank. The bank was granted a security interest in the tenants' personal property, including crops planted or grown by the tenants. Financing statements were filed on September 22, 1978, October 20, 1982, and July 23, 1985.

In October 1982 the landlords signed a lien waiver for all crops and commodities produced by the tenants. On October 10, 1985, and December 4, 1985, the bank issued lien waivers for the 1984 and 1985 crop years "only to the extent of Commodity Credit Corporation's interest." Although the landlord's lien waiver authorized payment to the producers of any proceeds of a loan or sale, the bank's lien waivers required that loan proceeds be disbursed jointly to the producer and the bank.

For the first six years of the leasehold the bank did not require its name to be included on any of the tenants' sales checks. In the spring of 1985 the tenants obtained a new guaranteed loan. Because their financial condition had become increasingly precarious the bank at that time changed its previous course of dealing and required the bank to be named as a co-payee on checks received. There is no indication that the landlords were aware of this change.

The tenants became victims of a wide-scale farm recession. They did not pay their cash rent for the 1985 crop year and filed for bankruptcy in December 1985. This litigation actually arose in two separate suits which were consolidated for trial. The parties agree that lien priority is the controlling question in each of the suits.

■ I. Rights, obligations and priorities involving security interests are usually controlled by Iowa Code chapter 554, Iowa's codification of the uniform commercial code [UCC]. A hiatus is however created by section 554.9104(b) which states that the UCC does not apply to a landlord's lien. The language creating this gap in the law does not hint how it should be filled.

We are aided by an outstanding article which carefully explores the dimensions of the dilemma in some detail. *See* Wilcox and Harty, *The Relative Priority of a Landlord's Lien and Article 9 Security Interest*, 35 Drake L.Rev. 27 (1985). Courts which have addressed the priority question have done so in either of two[2]

---

1. References are to the 1985 Code.

2. We agree with Wilcox and Harty's observation that the "first-in-time" approach cannot properly be considered a third approach, but rather is a specific application of the first, or majority, approach. 35 Drake L.Rev. at 37–38.

ways. Most courts have proceeded by what should be characterized as the non-code approach. Under this approach the priority question is resolved on the basis of precedents existing outside (and therefore often prior to) the UCC. *Hartwell v. Hartwell Co.*, 167 N.J.Super. 91, 400 A.2d 529 (1979), is cited as archtypical of the majority approach.

Under a minority approach, not widely adopted, the UCC is not set entirely aside, but remains effective to severely limit the scope of the statute (9–104(b)).[3] According to the minority view the exclusion of landlord's liens from the UCC means only that article 9 does not govern the creation of a landlord's lien or the priorities between competing landlord's liens. But the minority view holds that article 9 still provides the system for resolving priority disputes between a consensual security interest and any other (including a landlord's) lien. *Peterson v. Ziegler*, 39 Ill.App.3d 379, 350 N.E.2d 356 (1976), is the lead minority case.

We think the majority rule implements section 554.9104(b) whereas the minority rule would frustrate it. Under the statute a holder of the landlord's lien should not be treated as a UCC lienholder. We adopt the majority rule and hence resort to Iowa common law to resolve the priority conflict.

II. Prior to the UCC a bank's security interest was called a chattel mortgage. We considered cases in which a farmer executed a chattel mortgage on personal property, including growing crops and crops to be grown. We established the rule that the landlord's right to the increase of stock was superior to that of the chattel mortgage holder. *See Corydon State Bank v. Scott*, 217 Iowa 1227, 1232, 252 N.W. 536, 538–39 (1934); *see also Dilenbeck v. Security Sav. Bank*, 186 Iowa 308, 311–12, 169 N.W. 675, 677 (1918), *modified*, 186 Iowa 308, 172 N.W. 486 (1919).

Priorities in chattel mortgage cases often turned on whether a purchase-money mortgage was involved. A purchase-money mortgagee's interest in the property of the tenant, acquired with the money from the mortgagee's funds, was prior to the landlord's interest pursuant to a landlord's lien. *See Barrett v. Martzahn*, 186 Iowa 548, 550, 173 N.W. 72, 73 (1919). It appears that the funds loaned in the present case were used for general operational expenses and that a purchase-money mortgage is not involved. But on the facts it makes no difference because the landlord's lien is superior in either event.

■ If we were to assume a purchase-money mortgage is involved the security was given on crops yet to be grown. Under these circumstances *Dilenbeck* would give priority to the landlord's lien. *Dilenbeck* cannot be distinguished from the present case on the basis that the *Dilenbeck* mortgage was executed *after* the lease was entered into, and here the security agreement was executed *before* the lease was entered into. Time of execution is not determinative at common law as it is under the UCC. The emphasis in *Corydon State Bank* and *Dilenbeck* was on the type of property the interest was granted in, not when the lease was entered into. The bank here was given an interest in crops to be grown; hence priority was given to the landlord's lien.

The result is the same when not dealing with a purchase-money mortgage. Under Iowa's pre-code law, a statutory landlord's lien is superior to a blanket security interest. *See Atkins v. Womeldorf*, 53 Iowa 150, 152, 4 N.W. 905, 907 (1880). It does not matter whether the property was in existence at the time the chattel mortgage was executed or whether the property covered included crops not yet grown. *See Corydon State Bank v. Scott*, 217 Iowa at 1232, 252 N.W. at 539; *see also Dilenbeck*, 186 Iowa at 311–12, 169 N.W. at 676.

Thus, the landlord's lien is superior to the rights of the chattel mortgage with regard to crops not yet in existence at the time the chattel mortgage was entered into, whether for a purchase-money mortgage or a general purpose chattel mortgage.

---

3. Codified as Iowa Code § 554.9104(b).

III. The controversy does not end with the foregoing holding, however, because we have not responded to claims relating to waivers. As mentioned, in 1982 the landlords signed a waiver subordinating their lien to the bank's security interest. The landlords assert this waiver was in turn waived by the bank's course of conduct in failing to enforce it.

It is clear that cash rent was paid under the lease until the fall of 1985. The bank officers testified they were aware of the lease, even had a copy of it in the file they maintained in connection with the loan to the tenants. The bank fully approved the payment of cash rent and made no move to assert any superior claim under the 1982 subordination agreement until 1985, when a new loan officer for the bank changed the prior course of dealing.

A lien may be waived by a course of conduct which permits the debtor to dispose of property in contravention of the lien. Such a course of conduct waives the creditor's security interest after the sale and grants the debtor implied authority to sell the collateral, notwithstanding a contrary express provision in the loan contract. *See Ottumwa Prod. Credit Ass'n v. Keoco Auction Co.*, 347 N.W.2d 393, 396 (Iowa 1984); *Hedrick Sav. Bank v. Myers*, 229 N.W.2d 252, 255 (Iowa 1975); *Lisbon Bank & Trust Co. v. Murray*, 206 N.W.2d 96, 99 (Iowa 1973).

The record here supports the trial court finding that the bank, by its course of conduct, waived its claim of priority over the landlords' lien.

IV. We have yet to consider the change in the course of conduct. In 1985, as a part of a new loan agreement, the tenants were directed henceforth to have farm proceeds checks made out jointly to the tenants and the bank.

In *FS Credit Corp. v. Troy Elevator, Inc.*, 397 N.W.2d 735 (Iowa 1986), security agreements executed over several years contained provisions stating that the debtor could not dispose of or encumber the collateral without the express written consent of the secured party. One of the security agreements contained an additional provision which stated that "any waiver by the company of this paragraph or failure to require prior written consent shall in no way operate as a waiver of patron's obligations hereunder for any future sale, transaction or event." The creditor urged that the additional language precluded the trial court from finding that a prior course of dealing between the parties amounted to a waiver. We stated:

> One who has waived a condition in a contract may withdraw the waiver, so long as the other party is afforded a reasonable opportunity to perform the conditions of the contract that had been waived. Thus, the condition of the contract that was waived by a course of dealing may be reestablished by giving reasonable notice that the condition will be enforced in the future. FS gave such notice here. The additional terms of the 1982 agreements give notice that the written consent condition will apply on future sales, despite past waivers of the condition.

*Id.* at 738 (citations omitted).

The change in course of conduct in the present case was made known to the tenants but was not communicated to the landlords. The bank takes the position that no notice to the landlords of the change was necessary because the landlords were unaware of the tenants' arrangements with the bank. We think this position misreads the testimony of the landlords. The landlords were not entirely ignorant of the tenants' banking arrangements. The testimony of the elder Mr. Perkins on cross-examination indicated he paid little attention to the specifics of the banking arrangements but also indicated he feared his son was getting too deeply in debt with the bank. Significantly he stated his willingness to sign a landlord's lien waiver to the commodity credit corporation this way:

> Q. Do you acknowledge that this is entitled a lien waiver? A. I didn't think ... I always had my rent, and so that's the reason I signed that way. Even the bank always had my rent to me.

On this record we do not believe the bank's course of conduct can be ignored on

the basis of the landlords' lack of knowledge of the tenants' banking arrangements.

V. There is some indication in our *FS Credit Corp.* opinion that a new financing contract and notice to the debtors is sufficient to obviate the prior course of conduct waiver, with no requirement of notice to anyone other than the debtor. 397 N.W.2d at 735. But the prior course of conduct in *FS Credit Corp.* did not impact on a landlord's lien.

The legislature reached the policy decision when it placed landlord's liens outside the sweep of the UCC. The change in the bank's course of conduct was not binding on these landlords without some notice to them.

In several of its defenses, including the defense against the bank's course of conduct, the bank argues its priority status by advancing UCC principles. But UCC principles are not available to the bank in a priority dispute with a landlord's lien. This, again, is because of Iowa Code section 554.9104(b), which places landlord's liens outside the ambit of the UCC.

AFFIRMED.

All Justices concur except CARTER, J., who dissents.

CARTER, Justice (dissenting).

I dissent.

I have no disagreement with the court's conclusion that the statutory landlords' lien is prior to the bank's security interest in the crops. I cannot agree, however, with its additional conclusion that the bank, through a course of conduct, waived its rights under the subordination agreement executed by the landlords.

The obvious purpose of the subordination agreement was to protect the bank in the event the tenants, at some time in the future, were unable to pay their obligations to both the bank and the landlords. All of the parties involved in this transaction would have realized that it was essential that the annual cash rent be paid to the landlords if the tenants were to continue on the farm. Consequently, the only situation in which the bank would have been expected to invoke its contractual priority would involve the tenants' insolvency.

Until that situation arose, there was no reason for the bank to interfere with rental payments to the landlords. I therefore fail to see how the bank's failure to invoke its contractual priority at some earlier time is in any way indicative of a waiver of that right.